UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH SUAREZ,                                          :

                Plaintiff,                        :                14 Civ. 6505 (AJP)

         -against-                             :                **OPINION AND ORDER**

CAROLYN W. COLVIN, Commissioner of              :
Social Security,

                            :

             Defendant.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

                Plaintiff Joseph Suarez, represented by counsel (Sullivan & Kehoe), brings this action

pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision

of the Commissioner of Social Security (the "Commissioner") denying him Social Security disability

insurance benefits ("DIB").  (Dkt. No. 1: Compl.)  Presently before the Court are the parties' cross-

motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 15: Suarez

Motion for Judgment on the Pleadings; Dkt. No. 18: Gov't Motion for Judgment on the Pleadings.)

The parties have consented to decision of the case by a United States Magistrate Judge pursuant to

28 U.S.C. § 636(c).  (Dkt. No. 14: Consent Form.)

                For the reasons set forth below, the Commissioner's motion (Dkt. No. 18) is

GRANTED and Suarez's motion (Dkt. No. 15) is DENIED.

**FACTS**

                Suarez applied for DIB on April 9, 2010, alleging disability since March 1, 2010.

(Dkt. No. 6: Administrative Record ("R.") 308-12.)  After the Commissioner denied Suarez's

application on initial review (R. 139-40, 160-64), Suarez requested a hearing (R. 168-70).  On

January 26, 2011, Suarez appeared before ALJ Lucian Vecchio.  (R. 91-107.)  On February 25, 2011, ALJ Vecchio denied Suarez's DIB application, finding that Suarez could perform light work. (R. 140-51.)  Suarez appealed ALJ Vecchio's decision, and on May 3, 2012, the Appeals Council ordered reconsideration of the nature of Suarez's mental impairments, his maximum residual functional capacity ("RFC") and testimony from a vocational expert.  (R. 155-58.)

On October 25, 2012, ALJ Jack Russak held a hearing, but adjourned it to further develop the record and obtain consultative examination reports.  (R. 82-90.)  On March 21, 2013, ALJ Russak held another hearing at which Suarez appeared with counsel.  (R. 108-38.)   On April 12, 2013, ALJ Russak denied Suarez's application for DIB benefits.  (R. 59-81.) Suarez appealed ALJ Russak's decision, and on June 23, 2014, the Appeals Council denied review.  (R. 1-6.)

The period at issue is from March 1, 2010, when Suarez alleged he first became disabled, through April 12, 2013, the date of ALJ Russak's opinion.  (R. 76.)

**Suarez's Testimony & Non-Medical Evidence**

Joseph Suarez, born on November 8, 1961 in Puerto Rico, was 51 at the time of ALJ Russak's decision.  (R. 95, 308, 335.)  Suarez completed the fourth grade while living in Puerto Rico, came to the United States when he was seventeen or eighteen and obtained a vocational high school diploma.  (R. 95, 97, 116-17.)  Suarez can speak and read English.  (R. 118, 804, 810.)  He lives with his girlfriend in a street level apartment.  (R. 113.)

Prior to the onset of his alleged disability, Suarez worked as a pump mechanic from October 2009 through March 2010 and as an electrician from July 2008 through October 2009.  (R. 355-57.)  Suarez initially claimed that he left his work as a pump mechanic after being laid off for excessive absences due to injuries (R. 95), but subsequently testified that he quit because his back could not take the work any more (R. 118).

In support of his DIB claim, Suarez reported having difficult with lifting, sitting, standing, walking, squatting, kneeling, climbing stairs, reaching and using his hands.  (R. 343.)  He also reported problems with self-care activities like dressing, putting on his shoes and doing household chores.  (R. 339-41.)  Suarez is able to use public transportation.  (R. 341.)

At his initial January 26, 2011 hearing, Suarez testified that he could not work due to his back pain causing problems with sitting, standing and walking.  (R. 96, 98-99.)  Suarez also testified that because of difficulty with reading and spelling, he could not do less physically demanding jobs.  (R. 97.)  He also alleged that he was disabled due to fatigue from his hepatitis C and stated that since 2006, depression had affected his ability to concentrate or remember.  (R. 99-100.)  Suarez admitted to past drug and alcohol problems, although he stated that he stopped abusing these substances in 2006 or 2008.  (R. 101.)  Suarez was able to go to medical appointments and church.  (R. 98.)

At his March 21, 2013 hearing, Suarez again complained of back pain and depression.  (R. 120-22, 125.)  He testified that his back pain meant that he had difficulty taking care of personal grooming needs, like putting on his socks or stepping into and out of the shower.  (R. 113-14.)  Suarez testified that he was supposed to use a cane, but he did not have the cane and was able to come to the hearing alone by subway.  (R. 113-14.)  Although Suarez has a "bad liver," it does not cause him physical pain.  (R. 121-22.)  Suarez testified that he can only walk three or four steps before needing to take a five or ten minute break.  (R. 123.)  His girlfriend does the cooking and the shopping for both of them.  (R. 123.)  Suarez occasionally cleans the dishes, but his girlfriend does the other chores.  (R. 124.)  Suarez testified that that he ceased drug and alcohol use in 2008.  (R. 126.)

**Medical Evidence Before ALJ Russak**

    **Prior To March 2010**

        An October 1, 2004 x-ray of Suarez's lumbar spine showed minimal degenerative changes and minimal wedging of some upper bodies.  (R. 411, 413.)  On October 4, 2004, Dr. Meena Tamhankar of Castle Hill Medical diagnosed Suarez with acute lumbosacral[1] sprain and strain.  (R. 412.)

        On November 8, 2009, Suarez was admitted to Lincoln Medical and Mental Health Center in an unresponsive state after using cocaine, heroin and alcohol.  (R. 476-77, 499.)  He was diagnosed with hepatitis C, unspecified renal failure, heroin poisoning, and episodic cocaine abuse.  (R. 476-77.)  Suarez also was diagnosed with acute myocardial infarction.[2]  (Id.)  On November 9, 2009, Suarez was transferred to Bellevue Hospital.  (R. 494, 499.)  On November 10, 2009, he underwent an EKG, which showed no pericardial effusion,[3] mild left atrial dilation, mitral annular calcification,[4] mild mitral insufficiency[5] and mild tricuspid insufficiency.[6]  (R. 511-12.)  There was

---

[1]    "Lumbrosacral" refers to the veterbrae in the region of the back between the thorax and pelvis and to the triangular bone just below the lumbar vetebrae.  Dorland's Illustrated Medical Dictionary at 1076, 1662 (32d ed. 2012).

[2]    "Acute myocardial infarction" refers to gross necrosis of the heart occurring during the period when circulation to a region of the heart is obstructed.  Dorland's Illustrated Medical Dictionary at 934.

[3]    "Pericardial effusion" refers to the accumulation of fluid in the sac surrounding the heart.  Dorland's Illustrated Medical Dictionary at 596, 1412.

[4]    "Mitral annular calcification" refers to a circular pattern of tissue harding in the left atrioventricular heart valve.  Dorland's Illustrated Medical Dictionary at 94, 269, 1170.

[5]    "Mitral insufficiency" refers to defective functioning of the left atrioventricular heart valve.  Dorland's Illustrated Medical Dictionary at 945, 1170.

[6]    "Tricuspid insufficiency" refers to incomplete closure of the tricuspid valve.  Dorland's Illustrated Medical Dictionary at 945.

no evidence of pulmonary hyptertension.  (R. 512.)  A November 13, 2009 cardiovascular stress test was normal (R. 506-07), and Suarez was discharged (R. 499-500).

**From March 2010 Onward**

On June 7, 2010, Dr. Sharon Revan performed a consultative internal medicine exam on Suarez.  (R. 523-26.)  Suarez complained of overall joint pain due to arthritis.  (R. 523.)  He reported that standing caused back pain but that he did not have difficulty with sitting.  (Id.)  Suarez related that he could handle his own hygiene and cook but did not clean, do laundry or shop.  (R. 524.)  Dr. Revan observed that Suarez had a normal gait except for a limp on the left.  (Id.)  Suarez could walk on his heels and toes, and squat while holding onto something.  (Id.)  He did not need help getting on and off the examination table.  (Id.)  In his lumbar spine, Suarez had forty-five degrees of forward flexion as a result of back pain but full lateral flexion and rotation.  (R. 525.)  He had a full range of motion in his extremities, as well as full motor strength, no sensory deficits and normal reflexes.  (Id.)  Dr. Revan opined the Suarez had mild limitations walking distances and climbing stairs due to shortness of breath and unspecified limitations with standing due to his back pain.  (R. 526.)  Suarez had no limitations with his upper extremities for fine and gross motor activity.  (Id.)  Dr. Revan also found that Suarez had moderate limitations in activities of daily living secondary to his shortness of breath.  (Id.)  Suarez's overall prognosis was fair.  (Id.)

On June 7, 2010, Suarez also underwent a consultative psychiatric examination with Dr. Dmitri Bougakov.  (R. 527-30.)  Suarez reported difficulty falling asleep, occasional dysphoric moods, concentration difficulties, diminished sense of pleasure, loss of interest and social withdrawal.  (R. 527.)  Suarez stated that he was able to cook and use public transportation.  (R. 529.)  Suarez reported that he was not currently receiving psychiatric treatment, but had seen a psychiatrist when he was undergoing an alcohol abuse program in 2009.  (R. 527.)  Suarez admitted

ongoing alcohol use, although he claimed to have stopped using cocaine and heroin in 2008.  (Id.)

On examination, Suarez was cooperative and related adequately.  (R. 528.)  He had a neutral mood, coherent thought processes, intact concentration, and average intellectual functioning but mildly impaired memory.  (R. 528.)  Dr. Bougakov found that Suarzez was able to repeat three out of three objects immediately but only one out of three after five minutes.  (Id.)  Suarez was able to repeat five digits forward and two digits backward. (Id.)  Dr. Bougakov diagnosed Suarez with current alcohol abuse, cocaine and heroin abuse in remission and substance induced mood disorder.  (R. 529.)  Dr. Bougakov opined that Suarez did not present with any significant vocational difficulties aside from mild difficulties learning new tasks and performing complex tasks.  (Id.)  Dr. Bougakov opined that although Suarez's examination results were consistent with psychiatric and substance abuse problems, they were not significant enough to interfere with Suarez's ability to function on a daily basis.  (Id.)  Suarez had a guarded but fair prognosis due to his mild cognitive limitations and potentially ongoing alcohol abuse.  (Id.)

On September 7, 2010, Dr. Nelson Cabagnot of Wakefield Medical Professionals completed a medical assessment form for Suarez.  (R. 549-51, 553.)  Dr. Cabagnot reported that Suarez had severe lower back pain and osteoarthritis in several joints.  (R. 549.)  Dr. Cabagnot opined that Suarez only could lift less that five pounds and could walk or stand for less than two hours in an eight hour workday and for less than thirty minutes without interruption.  (Id.)  Dr. Cabagnot also opined that Suarez could sit for less than two hours in an eight hour workday and for less than thirty minutes without interruption, and could never climb, stoop, kneel, balance or crawl. (R. 550-51.)  Dr. Cabagnot did not state when or how often he examined Suarez.  (See R. 549-51.)  A September 29, 2010 referral from Wakefield to Montefiore Medical Center lists a history of hepatitis C and elevated liver function as Suarez's conditions.  (R. 553.)

On November 16, 2010, treating physician Dr. Andrew Gitkind examined Suarez. (R. 569-73.)  Suarez's chief complaint was of lower back pain that radiated diffusely into his right leg.  (R. 570.)  At that time, Suarez's only medication was Celexa.  (Id.)  Suarez reported being independent in all activities of daily living and able to walk without a cane.  (R. 571.)  On examination, Suarez walked normally, his sensation was intact and motor testing of his upper and lower extremities revealed full motor strength.  (Id.)  Suarez complained of some back tenderness on palpation and straight leg raising was negative bilaterally.  (Id.)  On examination, Dr. Gitkind observed a few areas of tenderness.  (Id.)  Dr. Gitkind opined that Suarez's symptoms were likely secondary to lumbar spondylosis[7] and facet mediated pain.  (R. 569, 571.)  Dr. Gitkind ordered x-rays of Suarez's lumbar spine and prescribed Tramadol and six weeks of physical therapy.  (R. 573.)

A November 26, 2010 x-ray of Suarez's lumbar spine showed that vetebral body heights and vertebral body alignment were maintained.  (R. 558, 587.)  The x-ray revealed disc space narrowing with end plate changes at L2-3 and osteophytes[8] consistent with degenerative disc disease, with spondylosis at other levels.  (R. 558, 587.)  In an undated follow-up note, Dr. Gitkind stated that Suarez reported overall improvement with physical therapy.  (R. 572.)  Suarez continued to complain of lower back pain but was not taking pain medication.  (Id.)  Suarez said "there ha[d] been an improvement overall" and Dr. Gitkind found "[n]o radicular component at all, no radiating pain" and "no lower extremity numbness or tingling."  (Id.)

On January 12, 2011, clinical psychologist Louis Martinez wrote a letter stating that

---

[7]     "Lumbar spondylosis" is a degenerative joint disease affecting the lumbar vetebrae and intervertebral discs, causing pain and stiffness.  Dorland's Illustrated Medical Dictionary at 1754.

[8]     An "osteophyte" is a bony excrescence or outgrowth.  Dorland's Illustrated Medical Dictionary at 1348.

Suarez had initiated treatment for his depression at the Morrisania Neighborhood Family Health Center on December 30, 2010.  (R. 559.)  Dr. Martinez noted that Suarez previously received treatment at Our Lady of Mercy until approximately 2008.  (R. 559.)  Dr. Martinez saw Suarez on January 13, 2011 for an intake examination to evaluate his complaints of depression.  (R. 804-07.)  Suarez reported this he had lost his marriage and job and was financially ruined as a result of his long history of drug and alcohol abuse.  (R. 804.)  Suarez stated that in 2009, he attempted suicide "via overdosing" and was treated at Bellevue Hospital.  (R. 805.)  Suarez lived with his girlfriend and their four year-old child.  (Id.)  On examination, Dr. Martinez observed that Suarez was cooperative and related well.  (R. 806.)  Suarez's mood was depressed, but his affect was full and stable.  (Id.)  Suarez had a coherent thought process and unimpaired impulse control, insight and judgment, with no deficits in attention, calculation, recall or language.  (Id.)  Suarez had "ok" interpersonal relations and adaptation, as well as average intelligence.  (R. 807.)  Dr. Martienz diagnosed Suarez with "Substance induced Mood Disorder vs Major Depression; Alcohol and Drug Abuse," hepatitis C, history of chronic substance abuse and limited financial resources.  (Id.)  Suarez had a global assessment of functioning ("GAF") score of fifty-five.  (Id.)[9/]

On January 27, 2011, Suarez also was examined by Morrisania psychiatrist Dr. Raquel Choua.  (R. 716, 809-11, 813-15.)  The examination was required before Suarez could start Interferon treatment for his hepatitis C.  (R. 716.)  Dr. Choua observed that Suarez's gait was normal.  (R. 809.)  Suarez related having a history of depression but denied any overt psychiatric symptoms

---

[9/]     A GAF score between forty-one and fifty indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Diagnostic & Statistical Manual of Mental Disorders at 32 (4th ed. 1994).  A GAF score between fifty-one and sixty indicates moderate symptoms or moderate difficulty in social, occupational or school functioning.  Id. A GAF of sixty-one to seventy represents some mild symptoms or some difficulty in social, occupational or school functioning.  Id.

and complained of insomnia without fatigue.  (R. 716, 810.)  Suarez denied homicidal or suicidal

thoughts as well as hallucinations or delusions.  (Id.)  Dr. Choua found Suarez cooperative, with a

coherent, logical thought process.  (Id.)  Suarez had fair to good insight, judgment and impulse

control.  (Id.)  He had a GAF score of fifty-eight.  (R. 810.)  Suarez's mood was euthymic.  (R. 809.)

Dr. Choua diagnosed Suarez with combinations of drug dependence, excluding opioid type, and an

unspecified episodic mood disorder.  (R. 809-10.)  Dr. Choua cleared Suarez for Interferon

treatment.  (R. 716.)

   On February 14, 2011, Dr. Gitkind administered a coricosteroid medial bundle branch

block injection at the right L3, L4 and L5 portion of Suarez's lumbar spine.  (R. 623-28.)  Following

the procedure, Suarez described his pain as "'much better.'"  (R. 626.)  At a follow-up examination

on April 6, 2011, Suarez told Dr. Gitkind that despite improvement after the injection, he continued

to have "some lower pain on the right," and Dr. Gitkind administered another injection.  (R. 666,

668, 674-80.)  During a follow-up phone call on April 7, 2011, Suarez reported no pain or

complications.  (R. 671.)

   On March 3, 2011, Suarez saw Dr. Zolalem Menglisiu at the Montefiore Medical

Center.  (R. 718.)  Suarez reported no new complaints.  (Id.)  Following some additional blood work,

Suarez began hepatitis C treatment on March 17, 2011.  (R. 718, 722-23.)  At an April 14, 2011

follow-up examination, Suarez denied fatigue, rashes or mood swings, and did not report being in

distress.  (R. 727.)  Suarez reported "feel[ing] good," and the attending physician noted that Suarez

was doing better clinically.  (Id.)

   Fifteen months later, on July 17, 2012, Suarez was seen by Dr. Hosneara Jinnat at

Montefiore for follow-up care for his hepatitis C and back pain.  (R. 735-58.)  Suarez stated that due

to insurance problems, he had not followed up previously with his care or taken any prescribed

medication.  (R. 735.)  Suarez complained of non-radiating back pain that affected his ability to sit, stand or walk for long periods, which he relieved with over-the-counter pain medication.  (Id.) Suarez reported past cocaine use but said he had been clean since 2005.  (R. 736-37.)  Suarez complained of right knee swelling from the previous year and noted that he had received two steroid spinal injections which helped relieve his back pain.  (R. 738.)  On examination, Suarez had a full range of motion, and his bilateral straight leg raising was positive, although Dr. Jinnat noted some "mild fullness" of Suarez's right knee.  (R. 739.)  Suarez complained of lumbosracral tenderness, but there was no muscle spasm.  (Id.)  Dr. Jinnat observed that Suarez walked with a slight limp but had normal motor power for his upper and lower extremities.  (Id.)  A psychological examination found Suarez alert and cooperative, with normal mood, affect, attention span and concentration.  (Id.) Suarez had no suicidal/homicidal ideation, delusions or hallucinations.  (Id.)  Dr. Jinnat referred Suarez for additional testing and for psychiatric treatment for his complaints of depression.  (R. 739-41.)

A July 29, 2012 MRI scan of Suarez's lumbar spine revealed diffuse disc bulges at L5-S1, L4-L5 and L2-L3 that flattened the thecal sac at two disc levels.  (R. 687, 759-60.)  The L5-S1 bulge was asymmetric.  (R. 759.)  At an August 14, 2012 follow-up visit, Dr.  Jinnat noted the MRI results and otherwise essentially repeated his previous examination findings.  (R. 761-65.) Suarez did not have any new complaints since his last visit.  (R. 761.)  Dr. Jinnat prescribed physical therapy and Tramadol for Suarez's back pain.  (R. 764.)

On August 20, 2012, Suarez received a lidocaine injection at the right sacroiliac joint from Dr. Gitkind.  (R. 702.)  Suarez tolerated the procedure well, with no complications.  (Id.)

On September 11, 2012, Suarez again saw Dr. Choua.  (R. 817-19.)  Dr. Choua observed that Suarez had a normal gait but complained that his knee arthritis and herniated lumbar

disc prevented him from climbing steps, bending or lifting.  (R. 817-18.)  At the time, Suarez attended church twice a week and assisted his wife with chores.  (R. 818.)  Suarez reported stable liver function since he stopped drinking alcohol.  (Id.)  He stated that he was "'sleeping well,'" and fell asleep "'right away.'"  (Id.)  On examination, Dr. Choua found Suarez's mood euthymic, his affect full and his thought content rational.  (R. 817.)  His GAF score was fifty-seven.  (R. 818.)  Dr. Choua diagnosed Suarez with an unspecified episodic mood disorder and prescribed therapy and medication.  (R. 818-19.)

On September 13, 2012, Suarez was treated by gastroenterologist Dr. Hillary Hertan at Montefiore for a follow-up on his hepatitis C.  (R. 771-74.)  Suarez's physical examination results were essentially normal.  (R. 772.)  Dr. Hertan restarted Suarez on Interferon treatment.  (R. 773.)

On September 20, 2012, Suarez again saw Dr. Gitkind at Montefiore.  (R. 775-76.)  Suarez reported that a previous spinal injection had provided good relief of his lower back pain.  (R. 775.)  Dr. Gitkind noted Suarez's "excellent pain relief which lasted about 14 months" following his 2011 injections.  (Id.)  On examination, Suarez exhibited normal motor strength in his lower extremities, and his sensation was intact.  (Id.)  Dr. Gitkind noted that Suarez had some complaints of right low back tenderness and paraspinal rigidity, but his findings were otherwise negative.  (R. 775-76.)  Dr. Gitkind opined that Suarez had done well following an injection but had low back pain secondary to spondylosis.  (R. 776.)  Suarez had no local tenderness and no tenderness to palpation. (Id.)  Dr. Gitkind recommended a right L3, L4 and L5 medial branch block and a medication refill for Tramadol.  (Id.)

On September 27, 2012, Suarez had a follow-up appointment with Dr. Hertan for his hepatitis C.  (R. 777-79.)  Examination findings were unremarkable, and Suarez had a full range of motion in his extremities.  (Id.)  Dr. Hertan refilled several of Suarez's prescriptions and performed

further testing.  (R. 707-09, 779-85.)  That same day, Suarez saw Dr. Jinnat for a back pain follow-up.  (R. 786-89.)  Suarez complained that his back and knee pain affected his ability to climb stairs or walk more than two blocks.  (R. 786.)  Dr. Jinnat noted that Suarez had a full range of extremity motion.  (R. 788.)  A physical examination of Suarez revealed no abnormalities.  (Id.)

On October 11, 2012, Suarez again saw Dr. Hertan for hepatitis C treatment, and Suarez reported no pain.  (R. 792-96.)  Abdominal sonograms for Suarez on October 9 and October 12, 2012 were normal.  (R. 777-79.)

On November 19, 2012, Dr. Marilee Mescon performed a consultative internal medical examination of Suarez.  (R. 820-24.)  Suarez reported that despite his physical impairments, he could shop, shower, bathe, dress and do laundry.  (R. 821.)  He reported spending his time attending appointments, listening to the radio and watching television.  (Id.)  Dr. Mescon reviewed Suarez's MRI results.  (R. 820.)  On examination, Suarez had a normal gait and a full range of motion through his spine and extremities.  (R. 822-23.)  Suarez had equal reflexes, unimpaired sensation and full motor strength.  (R. 823.)  Dr. Mescon opined that Suarez had no limitations in his ability sit, stand, climb, push, pull or carry heavy objects and a fair prognosis.  (R. 823.)

On November 19, 2012, Suarez also received a consultative psychiatric examination from Dr. Howard Tedoff.  (R. 825-28.)  Suarez stated that he helped "'a little'" with household maintenance and that despite being socially "inactive," he attended a church group and AA meetings twice a week.  (R. 825-26.)  Suarez told Dr. Tedoff that he lost his job because he was fired due to drug and alcohol abuse.  (R. 826.)

On examination, Suarez related well and was cooperative and responsive.  (Id.)  Suarez's mood was depressed, but Dr. Tedoff found his thought processes coherent and goal directed.  (R. 827.)  Suarez had intact attention and concentration.  (Id.)  He could do basic

calculations.  (Id.)  Suarez had good insight, but based on his reported history of substance abuse, somewhat impaired judgment.  (Id.)  Dr. Tedoff found that Suarez could follow and understand simple directions and perform simple tasks.  (R. 828.)  Suarez's attention and concentration skills were intact.  (Id.)  Suarez believed he was unable to maintain a full time regular work schedule. (Id.)  Dr. Tedoff noted that in the past Suarez had learned and performed complex tasks.  (Id.)  Dr. Tedoff found that Suarez's decision-making skills were suspect but seemed to be improving.  (Id.) Dr. Tedoff opined that Suarez had the capacity to relate adequately with others, although he did not let himself do so, and that Suarez was hiding from stress by staying home at all times except for appointments, therapy and church groups.  (Id.)  Dr. Tedoff's overall prognosis for Suarez was "guarded at best, particularly in the area of general mechanics."  (Id.)  In a separate medical source statement form, Dr. Tedoff opined that Suarez had a moderate limitation in carrying out complex instructions and mild limitations in carrying out simple instructions, understanding and remembering complex instructions and making judgments on complex work-related decisions.  (R. 829.)  Dr. Tedoff opined that Suarez had no limitations on interacting with supervisors, co-workers or the public.  (R. 830.)  Dr. Tedoff found that Suarez's limitations were "primarily physical constraints . . . exacerbated by psychiatric issues and a history of substance abuse."  (R. 829.)

On November 26, 2012, consultative examiner Dr. Lumesan completed a functional assessment of Suarez.  (R. 833-38.)  Dr. Lumesan opined that Suarez could lift and carry up to twenty pounds occasionally; could sit for four hours in an eight-hour workday; stand for two hours and walk for two hours in an eight-hour workday; could perform manual activities such as reaching and handling frequently; but could never climb, balance, stoop, kneel, crouch or crawl.  (Id.)

On December 27, 2012, Dr. Choua and Dr. Martinez completed a medical source statement form for Suarez.  (R. 845-47.)  They opined that Suarez had moderate limitations in his

ability to: maintain concentration, pace and attention for extended periods of time of at least two hours; understand, carry out and remember instructions; respond appropriately to supervision and changes in the work setting; use good judgment on the job; perform simple one and two step tasks; and behave in an emotionally stable manner.  (R. 845-46.)  They opined that Suarez had marked limitations in his activities of daily living as well as his ability to: sustain a routine without special supervision; perform activities within a schedule, maintain regular attendance and be punctual; respond to customary work pressures; and perform complex, repetitive or varied tasks.  (Id.)  In their opinion, Suarez's symptoms had been present at the same level of severity since before 2010, and he was likely to be absent from work four or more days per month as a result of his impairments and/or treatment.  (R. 846.)  They identified drugs and alcohol abuse as material factors in Suarez's mental condition but opined that even if Suarez were to cease drug and alcohol use, there would be no change in his mental condition because he had suffered permanent damage from it.  (R. 846-47.)

On December 31, 2012, Suarez was treated by Dr. Jinnat at Montefiore for follow-up relating to his back pain.  (R. 854-57.)  Suarez complained of chronic back pain and chronic right knee pain.  (R. 854.)  He reported that because of the pain, he found it difficult to climb stairs and could only walk two blocks.  (R. 854.)

On January 22, 2013, Dr. Florez completed a medical assessment form for Suarez. (R. 841-43.)  Dr. Florez had begun treating Suarez that month.  (R. 111.)  Dr. Florez opined that Suarez could occasionally lift and/or carry ten pounds, could stand or walk for one hour in an eight hour work day but only for fifteen minutes without interruption, and could sit for four hours in an eight hour work day but only for thirty minutes without interruption due to the limited range of motion in his spine and right knee.  (R. 841-42.)  Suarez could occasionally climb but could not kneel, crawl or crouch.  (R. 842.)  Suarez had environmental limitations with respect to heights,

moving machinery, and vibration.  (R. 843.)

On March 28, 2013, Dr. Choua wrote a letter stating that Suarez suffered from recurrent and moderate major depressive disorder that was in remission, as well as chronic insomnia and had a history of alcohol and cocaine abuse, in full remission.  (R. 862-63.)

**Vocational Expert Testimony**

ALJ Russak heard testimony from vocational expert Esperanze DiStefano.  (R. 128-34, 302-07.)  DiStefano testified that a hypothetical individual of Suarez's age, education and work history could not perform Suarez's past relevant work if limited to light work with an option to sit or stand at will, with additional restrictions of never climbing ramps or stairs or crawling and only occasionally climbing ladders, ropes, or scaffolds and stooping, crouching, or kneeling, and that involved performing simple and routine tasks with only occasional decision-making, no interaction with the public and only occasional interaction with coworkers.  (R. 130.)  Such an individual, however, could work as an assembler, office helper or mail clerk, and  these jobs exist in significant numbers in the national and local economies.  (R. 130-31.)  DiStefano testified that if the hypothetical individual were to have three or more absences from work per month,"that would be more than what is normally tolerated by most employers." (R. 132.)  Finally, in answer to questions by Suarez's counsel, DiStefano testified that if such an individual's ability to maintain concentration, pace and attention was restricted to two-thirds of the day, leaving the individual off-task for a third of the day, the individual would not be able to maintain employment.  (R. 133-34.)

**ALJ Russak's Decision**

At the first step of the five-step sequential analysis, ALJ Russak found the Suarez "has not engaged in substantial gainful activity since March 1, 2010, the alleged onset date."  (R. 65.)  At the second step, ALJ Russak found that Suarez had the following severe impairments:

"[d]egenerative disc disease of the lumbar spine with right-sided lumbar spondylosis and facet arthropathy; arthritis of the right knee; hepatitis C infection; obesity; depressive disorder; and alcohol and polysubstance use, in remission . . . ."  (R. 65.)  ALJ Russak found that Suarez did not have a severe cardiac impairment because he has exhibited no cardiac symptoms since being hospitalized for drug and alcohol abuse complications that included a myocardial infarction in November 2009, before the March 2010 alleged onset date.  (R. 65.)

At the third step, ALJ Russak found that Suarez "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  (R. 65.)  ALJ Russak found that Suarez's knee disorder did "not satisfy Listing 1.02A (Major dysfunction of a joint)" because "he has not exhibited an inability to ambulate effectively" and "[m]ultiple treating and examining sources have noticed that [Suarez] had normal gait and stance and did not require an assistive device to ambulate."  (Id.)  ALJ Russak determined that Suarez's spinal impairment "does not satisfy the requirements of Listing 1.04A (Disorders of the spine), as he has not exhibited each of the necessary neurological deficits."  (Id.)  Specifically, ALJ Russak noted that "[t]he same treating and examining sources have noted normal motor strength and sensation on neurological examinations throughout the record."  (Id.)  ALJ Russak also found that Suarez's hepatitis C "does not satisfy the requirements of Listing 5.05 (Chronic liver disease), as he has not exhibited any of the required clinical findings or abnormal laboratory or diagnostic test results."  (Id.)  ALJ Russak considered Suarez's obesity in conjunction with each these conditions and found that "[i]n this case, the obesity does not appear to further impact his condition to the extent that the Listings requirements are medically equaled."  (R. 65-66.)

ALJ Russak also found that "[t]he severity of [Suarez's] mental impairments,

considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04

(Affective disorders) and 12.09 (Substance addiction disorders)." (R. 66.)  In doing so, he

specifically "considered whether the 'paragraph B' criteria are satisfied." (Id.)  As ALJ Russak

noted, those criteria require that:

> [T]he mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

(Id.)  ALJ Russak found that Suarez had moderate restriction in his activities of daily living based

on his statements to Dr. Tedoff and his hearing testimony.  (Id.)  These restrictions did not rise to

the level of marked, however, because "the extent of the assistance that [Suarez] described appears

to be routine in nature and can be provided by his household partner, without the need for assistance

from a home health aide." (Id.)

ALJ Russak determined that Suarez had moderate limitations with respect to social

functioning and concentration, persistence and pace.  (Id.)  Although Suarez's isolative behavior

represented a significant restriction in his social functioning, ALJ Russak noted that it was not a

marked limitation because Suarez remained able to travel independently and attend religious

services and chemical recovery programs by himself.  (Id.)  Suarez did not demonstrate any marked

limits in his concentration, persistence or pace because "neither consultative psychological examiner

noted more than a mild impairment in attention, concentration or recent or remote memory," and

Suarez himself "stated that he spends his time watching TV and listening to the radio, without any

admitted limitation imposed by his psychiatric impairment." (Id.)

ALJ Russak observed that Suarez experienced no episodes of decompensation of

extended duration.  (Id.)  Suarez also had not required inpatient hospitalization or emergency room

treatment for his psychiatric disorders since his alleged onset date and instead "receive[d] only routine outpatient therapy once every three weeks and [saw] a psychiatrist only once every two months . . ."  (R. 66-67.)

Finally, ALJ Russak found that "the evidence fails to establish the presence of the 'paragraph C' criteria" for affective disorders because "there is no medical evidence or testimony" that Suarez ever experienced repeated episodes of decompensation, a residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or changes in the environment would be predicted to cause him to decompensate, or a current history of one or more years' inability to function outside a highly supportive living environment.  (R. 67.)

ALJ Russak next found that Suarez had the RFC to

> perform a range of light work as defined in 20 CFR 404.1567(b).  Specifically, in addition to the exertional requirements, he must be allowed to sit or stand alternatively at will, provided that he is not off-task more than 5% of the work period.  Further, he can never climb ramps or stairs; can occasionally climb ladders, ropes or scaffolds; can occasionally stoop, crouch, and kneel; and can never crawl.  He can only occasionally push or pull bilaterally.  In terms of mental limitations, he can work only in simple, routine tasks, in a low-stress job defined as having no decision-making required and no changes in the work setting.  In addition, the work must be allowed off-task 5% of the day, in addition to regularly scheduled breaks, with no judgment required on the job.  Finally he must have no interaction with the public and only occasional interaction with co-workers.

(R. 67.)  ALJ Russak "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (Id.)  He also "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p."  (R. 67.)

ALJ Russak provided a detailed analysis of Suarez's testimony and of the medical evidence of record.  (R. 67-74.)  In particular, ALJ Russak thoroughly considered Dr. Gitkind's November 2010 examination results, in which Dr. Gitkind opined that Suarez had lower back pain,

secondary to lumbar spondylosis and facet mediated pain, recommended that Suarez undergo physical therapy, and observed that Suarez was independent in activities of daily living and had generally normal examination results, with only a few areas of tenderness. (R. 68-69.) ALJ Russak also reviewed Dr. Gitkind's subsequent treatment notes for Suarez, including his notes from his administration of sacroiliac injection and medial branch blocks to the right side of Suarez's lumbar spine in early 2011. (R 69.) ALJ Russak noted that "[f]ollowing the injections in early 2011, [Suarez] underwent no further treatment for his back until later in 2012." (Id.) ALJ Russak also discussed Suarez's lumbar spine MRI in July 2012, which revealed that Suarez had an asymmetric diffuse disk bulge and several other diffuse disk bulges, leading Dr. Gitkind to administer a further sacroiliac injection. (Id.) Finally, ALJ Russak considered Dr. Gitkind's September 2012 progress note stating that Suarez had experienced good pain relief following that August 2012 procedure. (Id.) ALJ Russak determined that:

> After careful consideration of the evidence, the undersigned finds that [Suarez's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Suarez's] statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible . . . [because] the objective physical and mental status examination results . . . do not reveal significant deficits in functioning. Further, objective tests such as diagnostic imaging of the lumbar spine and of [Suarez's] abdomen have not revealed acute abnormalities of the type that would be expected to eliminate [Suarez's] ability to function over the course of a 40-hour workweek.

(R. 71.)

ALJ Russak also considered Suarez's symptoms in relation to all seven factors set forth in SSR 96-7p, "because symptoms may sometimes suggest a greater degree of impairment than can be shown by the medical evidence alone." (R. 71-72.) ALJ Russak noted that although Suarez denied performing productive activity during the day in his hearing testimony, Suarez admitted in other parts of the record to "much greater abilities to handle his own personal care and other

household chores." (R. 72.) ALJ Russak observed that Suarez's "symptoms appear to be relatively mild and intermittent, as he reported to Dr. Gitkind a 14-month period of relief in his back pain, and as the objective reports in the record from his psychiatric treatment providers and from the consultative examiners do not describe particularly frequent or intense mental health symptoms." (Id.) ALJ Russak discussed the conflict between Suarez's report to Dr. Tedoff that he stopped working in March 2010 not because of his symptoms but because he was fired due to his drug and alcohol abuse and Suarez's testimony at the hearing that he quit his job due to back pain. (Id.) Finally, ALJ Russak noted that Suarez did not begin receiving treatment for his back pain until November 2010 and continued looking for work for several months after the alleged onset of his disability in March 2010. (Id.)

ALJ Russak gave some weight to the opinions of consultative examiners Dr. Bougakov and Dr. Revan. (R. 72.) Although "[e]ach source was duly qualified and had the opportunity to perform a detailed clinical interview with and comprehensive physical or mental status examination of" Suarez, "subsequent objective evidence has come in to suggest that [Suarez] has additional functional limitations that the examiners would not have been aware of [at] that time." (R. 72.)

ALJ Russak gave little weight to Dr. Cabagnot's September 2010 opinion that due to back pain, Suarez could lift and carry less that five pounds, stand and walk less than two hours and sit less than two hours in an eight hour workday. (R. 73.) The ALJ also gave little weight to Dr. Florez's January 2012 opinion that due to Suarez's limited range of motion in his spine and right knee, he could only lift and carry ten pounds, stand and walk for one hour and sit for four hours in an eight hour workday. (Id.) ALJ Russak characterized both as treating source statements. (Id.)

According to ALJ Russak:

> These reports are given little weight, as the diagnostic imaging . . . is not significantly abnormal regarding the spine, as clinical examination findings have revealed no neurological deficits in the lower extremities of the sort that might affect his ability to stand or walk over the course of a workday. Further, there is no diagnostic imaging to confirm that [Suarez] does indeed have severe osteoarthritis in multiple joints. Therefore, these reports are not well supported by the objective medical evidence of record and are not consistent with the record as a whole.

> For similar reasons, little weight is also given to the December 2012 report from Dr. Martinez and Dr. Choua, respectively [Suarez's] treating psychologist and psychiatrist. The other reports from these sources do not describe a particularly frequent or intense treatment relationship, and are devoid of any abnormal mental status examination findings. The two mental consultative examination reports also contain largely normal mental status examination findings. Similarly, [Suarez] has not required inpatient hospitalization or even emergency room treatment for his psychiatric disorders at any time since the alleged onset date. The report states that its limitations were applicable prior to 2010, but it is significant to note that [Suarez] was still engaging in substantial gainful activity at that time, and he did not stop working because of his depression. Therefore, their conclusions are not well supported by the objective evidence of record, and are not consistent with the conclusions of any other mental health source contained within the case record.

(R. 73, record citations omitted.)

ALJ Russak gave some weight to Dr. Lumesan's November 2012 opinion that Suarez could lift and carry up to twenty pounds, sit for four hours and stand and walk for a total of four hours in an eight hour workday because "[t]hese conclusions are more in line with the objective findings, which show tenderness and limited range of motion in the low back but without any neurological deficits affecting the lower extremities, and with the X-ray and MRI findings showing degenerative disc disease but no significant spinal canal or nerve root compromise." (Id.) ALJ Russak also gave some weight to Dr. Mescon's November 2012 consultative examination finding that Suarez had no limitations on his ability to perform exertional activities, determining that her findings "are generally consistent with the other clinical findings noted throughout this record, but her statement that [Suarez] had no limitations at all is not consistent with the record as a whole."

(R. 73-74.)   Finally, ALJ Russak gave "great weight" to Dr. Tedoff's opinion because "[h]is conclusions as to [Suarez's] social functioning provide the most reasonable explanation in the record for the disconnect between the generally benign mental status findings (indeed, Dr. Tedoff noted no mental status abnormalities at all), and the fact that [Suarez] has isolated himself socially to some extent." (R. 74.)

ALJ Russak next found that Suarez "is unable to perform any past relevant work." (R. 74.)  ALJ Russak first identified Suarez's past work as a maintenance electrician, electronics installer and pump mechanic, and determined that only the maintenance electrician position qualified as past relevant work because it was the only one that Suarez "performed . . . at the substantial gainful activity level, and for long enough to satisfy the specific vocational preparation requirements."  (Id.)   Based on the vocational expert's testimony, ALJ Russak found that an individual of Suarez's age, education and work experience with Suarez's RFC would be unable to work as a maintenance electrician.  (R. 74.)

Finally, ALJ Russak discussed the applicability of the medical-vocational guidelines. (R. 74-75.)  He determined that "if [Suarez] had the residual functional capacity to perform the full range of light work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.18 and Rule 202.11." (R. 75)  However, ALJ Russak determined that because Suarez's ability to perform all or substantially all of the requirements of light work "has been impeded by additional limitations," vocational expert testimony was required to determine "the extent to which these limitations erode the unskilled light occupational base."  (Id.)

Based on the vocational expert's testimony, ALJ Russak found that an individual with Suarez's age, education, work experience and RFC could find jobs in such occupations as an assembler, mail clerk or office helper.  (R. 75-76.)  ALJ Russak  found Suarez not disabled.  (R. 76.)

**Additional Evidence And The Appeals Council's Decision**

On April 23, 2013, Suarez's counsel sought Appeals Council review of ALJ Russak's decision, alleging that the ALJ committed reversible error in mischaracterizing the vocational expert's testimony, failed to give adequate weight to the opinions of Suarez's treating physicians, erroneously relied on the opinion of consultative examiner Dr. Tedoff to determine the severity of Suarez's impairments, and that "[s]ince the evidence from examining physicians documents that, at the most, [Suarez] can perform sedentary work, he is disabled under Rule 210.10 of the Grids." (R. 54-56.)  In support of his appeal, Suarez submitted an SSA adult function report by prepared by Oneida Rodriguez from Februray 2014 and records from All Med and Rehabilitation Center from March 2013.  (R. 395-403, 864-67.)  Suarez also submitted the results of a February 2014 evaluation by the Federation Employment and Guidance Service ("FEGS").  (R. 8-52.)

On June 23, 2014, the Appeals Council denied Suarez's request for review.  (R. 1-4.) In reaching its decision, the Appeals Council considered the reasons Suarez disagreed with ALJ Russak's decision, the February 2014 SSA adult function report and Suarez's March 2013 All Med records.  (R. 1-2.)  The Appeals Council determined that "this information does not provide a basis for changing the [ALJ's] decision."  (R. 2.)  In addition, the Appeals Council found that Suarez's newly submitted evidence from FEGS was about a later time and therefore "does not affect the decision about whether you were disabled beginning on or before April 12, 2013." (R. 2.)[10/]  ALJ Russak's opinion therefore became the final decision of the Commissioner.

---

[10/]   Suarez, who is represented by experienced counsel, does not argue that the Appeals Council improperly rejected his additional evidence nor does he rely upon that evidence in challenging ALJ Russak's decision.  (See generally Dkt. No. 15: Suarez Br.)

## ANALYSIS

## I.    THE APPLICABLE LAW

### A.    Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[11/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388

---

[11/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[12]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[13]

**B.     Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[14] "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y.

---

[12]     See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[13]     See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

[14]     See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

July 26, 2002) (Peck, M.J.).[15/]

      The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[16/] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[17/]

      The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

---

[15/]   See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[16/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[17/]   See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[18/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[18/]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

can perform considering not only his medical capacity but also his age, education and training.  See,

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[19/]

C.      **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner

in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.

Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700

(2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254

F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating

physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must

consider the following factors in determining the weight to be given such an opinion: (1) the length

of the treatment relationship and the frequency of examination; (2) the nature and extent of the

treatment relationship; (3) the evidence that supports the treating physician's report; (4) how

consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the

physician in contrast to the condition being treated; and (6) any other factors which may be

significant. 20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

---

[19/]    See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); Foxman v. Barnhart, 157 F. App'x 344, 346-47 (2d Cir. 2005); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to Snell but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).]

II.     **APPLICATION TO SUAREZ'S CLAIM**

A.      **Suarez Was Not Engaged In Substantial Gainful Activity**

The first inquiry is whether Suarez was engaged in substantial gainful activity after his application for DIB benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit."  20 C.F.R.  § 404.1510.  ALJ Russak's conclusion that Suarez did not engage in substantial gainful activity during the applicable time period (see page 15 above) is not disputed by Suarez or the Commissioner.  (See generally Dkt. 15: Suarez Br.; Dkt. No. 19: Gov't Br.)  The Court therefore proceeds with the analysis.

B.      **Suarez Demonstrated "Severe" Impairments That Significantly Limited His Ability To Do Basic Work Functions**

The second step of the analysis is to determine whether Suarez proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).

ALJ Russak found that Suarez's degenerative disc disease of the lumbar spine with right-sided lumbar spondylosis and facet arthropathy, arthritis of the right knee, hepatitis C, depressive disorder and drug and polysubstance use, currently in remission, all constituted severe

impairments.  (See pages 15-16 above.)[20/]  The Court proceeds to the third step of the five-part analysis.

**C.      Suarez Did Not Have A Disability Listed In Appendix 1 Of The Regulations**

The third step of the five-step test requires a determination of whether Suarez had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Russak found that notwithstanding Suarez's multiple severe impairments, he "does not have an impairment of combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  (See page 16 above.)  ALJ Russak specifically discussed why Suarez's spinal impairments, arthritis, hepatitis C, obesity, mental impairments and substance abuse each do not rise to Listings-level.  (See pages 16-17 above.)

Suarez is represented by counsel and does not argue that any of his impairments meet or equal a Listed condition.  (See generally Dkt. No. 15: Suarez Br.)  The Court therefore proceeds with the analysis.

---

[20/]    ALJ Russak also found that Suarez's cardiac condition is not severe because he has not exhibited symptoms since 2009.  (See page 16 above.)  Suarez, represented by counsel, does not challenge ALJ Russak's determination that his cardiac symptoms do not meet the standard for a severe impairment.  (See generally Dkt. No. 15: Suarez Br.)

D.   **Residual Functional Capacity And Credibility Determinations**

1.   **Residual Functional Capacity Determination**

ALJ Russak found that Suarez had the RFC to

> perform a range of light work as defined in 20 CFR 404.1567(b).  Specifically, in addition to the exertional requirements, he must be allowed to sit or stand alternatively at will, provided that he is not off-task more than 5% of the work period.  Further, he can never climb ramps or stairs; can occasionally climb ladders, ropes or scaffolds; can occasionally stoop, crouch, and kneel; and can never crawl. He can only occasionally push or pull bilaterally.  In terms of mental limitations, he can work only in simple, routine tasks, in a low-stress job defined as having no decision-making required and no changes in the work setting.  In addition, the work must be allowed off-task 5% of the day, in addition to regularly scheduled breaks, with no judgment required on the job.  Finally he must have no interaction with the public and only occasional interaction with co-workers.

(See page 18 above.)

First, Suarez argues that ALJ Russak erred making his RFC determination by not giving controlling weight to the December 2012 opinion of treating psychiatrist Dr. Choua that Suarez had multiple marked and moderate limitations and was likely to be absent from work more than four days per month.  (Dkt. No. 15: Suarez Br. at 15-16.)  Specifically, Suarez claims that Dr. Choua's December 2012 opinion "is consistent with the record, as it aligns with both Dr. Martinez and Dr. Tedoff's opinions."  (Suarez Br. at 16.)[21/]  This argument is unpersuasive.

Even though "the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."  Halloran v.

---

[21/]   It is unsurprising that Dr. Choua's December 2012 opinion aligns with Dr. Martinez's opinion, as the December 2012 medical source statement was prepared jointly by Dr. Choua and Dr. Martinez.  (See page 13-14 above.)

Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted).[22]  Furthermore, "the opinion of a treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling," since such statements are not medical opinions, but rather "opinions on issues reserved to the Commissioner." Mack v. Comm'r of Soc. Sec., 12 Civ. 186, 2013 WL 5425730 at *8 (S.D.N.Y. Sept. 27, 2013); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).[23]  Moreover, in rejecting a treating physician's opinion, an ALJ need not expressly enumerate each factor considered if the ALJ's reasoning and adherence to the treating physician rule is clear.  See, e.g., Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (plaintiff "challenges the ALJ's failure to review explicitly each factor provided in 20 C.F.R. § 404.1527(c).  We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004) (affirming ALJ opinion which did not discuss the treating physician rule, but where "the substance of the treating physician rule was not traversed").

---

[22]     Accord, e.g., Penfield v. Colvin, 563 F. App'x 839, 840 (2d Cir. 2014); Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." (citations omitted)); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."); Jimenez v. Astrue, 12 Civ. 3477, 2013 WL 4400533 at *10 (S.D.N.Y. Aug. 14, 2013) ("[T]he opinions of a treating physician 'need not be given controlling weight where they are contradicted by other substantial evidence in the record.'"); Van Dien v. Barnhart, 04 Civ. 7259, 2006 WL 785281 at *9 (S.D.N.Y. Mar. 24, 2006) ("[The] general rule of deference does not apply where 'the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.'").

[23]     See also, e.g., Roma v. Astrue, 468 F. App'x 16, 18 (2d Cir. 2012); Priel v. Astrue, 453 F. App'x 84, 86 (2d Cir. 2011); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *17 (S.D.N.Y. July 2, 2013) (Peck, M.J.), report & rec. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014).

ALJ Russak expressly gave little weight to the December 2012 joint opinion from Dr. Choua and Dr. Martinez because it was not well-supported by the underlying medical evidence contained in their other reports, its statements about the duration of Suarez's allegedly disabling symptoms were contradicted by Suarez's employment history, and it conflicted with the reports from consultative examiners.  (See page 21 above.)

ALJ Russak accurately characterized the medical evidence contained in the other records from Dr. Choua and Dr. Martinez.  Although both doctors diagnosed Suarez with depression and/or a mood disorder, both consistently reported largely normal mental status findings.  (See pages 7-11 above.)  Specifically, in January 2011, Dr. Martinez found that although Suarez had a depressed mood, his affect was full and stable and he had a coherent thought process with unimpaired insight, impulse control and judgment, no deficits in attention, recall or language and "ok" interpersonal relations.  (See page 7-8 above.)  In January 2011, Dr. Choua found Suarez to have a euthymic mood, no overt psychiatric symptoms other than insomnia, and fair to good insight, judgment and impulse control.  (See page 8-9 above.)  In September 2012, Dr. Choua again found Suarez to be euthymic, with a full affect and rational though content.  (See page 11 above.)  Suarez had repeated GAF scores in the no more than moderately limited range of fifty-five to fifty-eight in January 2011 and September 2012.  (See pages 8-9, 11 above.)  Finally Dr. Choua's March 2013 letter noted that Suarez's depressive disorder, chronic insomnia and substance abuse were in remission.  (See page 15 above.)

Furthermore, the report from Dr. Choua and Dr. Martinez stated that Suarez's psychiatric limitations existed at the same level of severity prior to 2010, when Suarez allegedly became disabled.  (See page 14 above.)  Suarez, however, did not cease working until March 2010, as a result either of his back pain or because he was fired for drug and alcohol abuse, not because

of his depression.  (See pages 2, 12 above.)  Thus, ALJ Russak's observation that Suarez "was still engaging in substantial gainful activity at that time, and he did not stop working because of his depression" (see page 21 above) was accurate.

ALJ Russak also was correct to observe that the mental consultative examination reports for Suarez contain largely normal mental status examination findings.  (See page 21 above.)  In June 2010, Dr. Bougakov found Suarez to have a neutral mood with coherent thought processes, intact concentration and only mildly impaired memory, with the ability to cook and use public transportation.  (See pages 5-6 above.)  Dr. Bougakov opined that Suarez had no significant vocational difficulties other than mild difficulties learning new tasks or performing complex tasks.  (See page 6 above.)  In November 2012, Dr. Tedoff similarly found that Suarez related well and had coherent, goal-directed thought processes despite a depressed mood.  (See page 12 above.)  Dr. Tedoff went on to find that Suarez had good insight but somewhat impaired judgment.  (See page 13 above.)  Dr. Tedoff noted that Suarez had a moderate limitation in carrying out complex instructions, but otherwise only mild or no limitation in all other work-related areas of mental functioning.  (See page 13 above.)  These findings are consistent with one another and with the other evidence supporting ALJ Russak's RFC determination.

Suarez also argues that ALJ Russak erred because Dr. Gitkind's November 16, 2010 examination results are "consistent with the record as [they are] supported by an MRI of the lumbar spine dated July 29, 2012."  (Suarez Br. at 16.)  Dr. Gitkind, however, provided only a description of Suarez's symptoms and their causes, not a medical opinion regarding Suarez's level of functioning and limitations, if any.  (See page 7 above.)  Moreover, ALJ Russak thoroughly considered Dr. Gitkind's November 2010 examination results in determining Suarez's RFC.  (See pages 18-19 above.)  In particular, ALJ Russak noted Dr. Gitkind's opinion that Suarez had lower back pain,

secondary to lumbar spondylosis and facet mediated pain, his recommendation that Suarez undergo physical therapy, and his observation that Suarez was independent in activities of daily living and had generally normal examination results, with only a few areas of tenderness.  (See pages 7, 18-19 above.)  ALJ Russak also reviewed Dr. Gitkind's subsequent treatment notes for Suarez, which included the administration of a sacroiliac injection and medial branch blocks to the right side of Suarez's lumbar spine in early 2011.  (See pages 9-11, 19 above.)  As ALJ Russak noted, "[f]ollowing the injections in early 2011, [Suarez] underwent no further treatment for his back until later in 2012."  (See pages 9-10, 19 above.)  Suarez's lumbar spine MRI in July 2012 revealed that he had an asymmetric diffuse disk bulge and several other diffuse disk bulges, leading Dr. Gitkind to administer a further sacroiliac injection.  (See page 10 above.)  ALJ Russak discussed the MRI results in his RFC determination.  (See page 19 above.)  Finally, ALJ Russak considered Dr. Gitkind's September 2012 progress note stating that Suarez had experienced good pain relief following his August 2012 injection.  (See pages 11, 19 above.)  Thus, while Suarez is correct that Dr. Gitkind's November 2010 examination results are consistent with the results of Suarez's July 2012 lumbar spine MRI (Suarez Br. at 16), that fact does not undermine ALJ Russak's RFC determination.

In addition, Suarez challenges ALJ Russak's determination that the treating source statements from Dr. Cabagnot and Dr. Florez were entitled to little weight.  (Suarez Br. at 16-17.)[24] ALJ Russak gave little weight to Dr. Cabagnot's opinion that Suarez could lift and carry less than five pounds, stand and walk less than two hours and sit less than two hours in an eight hour

---

[24]   Suarez appears to concede that neither Dr. Cabagnot nor Dr. Florez are treating physicians (see Suarez Br. at 16), but the record indicates that they were and ALJ Russak treated them as such (see pages 6, 14-15, 20 above).

workday, due to lower back pain and severe osteoarthritis in multiple sites.  (See pages 6, 20 above.)

Similarly, ALJ Russak gave little weight to Dr. Florez's opinion that due to the limited range of

motion in his spine and right knee, Suarez could only lift and carry ten pounds, stand and walk for

one hour and sit for four hours in an eight hour work day.  (See pages 14-15, 20 above.)  Suarez

claims that ALJ Russak erred because "Dr. Cabagnot's opinion is not inconsistent with the treatment

records, as Dr. Revan's consultative exam noted that [Suarez] had reduced range of motion of the

lumbar spine with 45 degrees of flexion, positive straight leg raise on the right and right internal

rotation with low back pain."  (Suarez Br. at 16-17.)  Suarez goes on to accurately describe the

content of Dr. Florez's opinion but does not explain how ALJ Russak allegedly erred in addressing

that opinion.  (See Suarez Br. at 17.)

 ALJ Russak did not reject either opinion based on any conflict with Dr. Revan's

consultative examination results.  (See page 20-21 above.)[25/]  Instead, he rejected those opinions as

not well supported by the objective medical evidence because Suarez's diagnostic imaging was "not

significantly abnormal regarding the spine, as clinical examination findings have revealed no

neurological deficits in the lower extremities of the sort that might affect his ability to stand or walk

over the course of a workday" and "there is no diagnostic imaging to confirm that [Suarez] does

indeed have severe osteoarthritis in multiple joints."  (See page 21 above.)  Both Suarez's lumbar

spine x-rays from November 2010 and his July 2012 lumbar spine MRI revealed degenerative disc

disease but neither were accompanied by any diagnosis suggesting that Suarez cannot walk or stand

---

[25/] Dr. Revan's opinion does not support Suarez's argument.  Dr. Revan found that Suarez had only mild limitations walking distances and climbing stairs due to shortness of breath, moderate limitations in his activities of daily living, and unspecified limitations with standing due to his back pain.  (See page 5 above.)  Dr. Revan found Suarez's overall prognosis to be fair.  (See page 5 above.)  Nothing in Dr. Revan's opinion suggests that Suarez had limitations as severe as those posited by Dr. Cabagnot and Dr. Florez.

normally.  (See pages 7, 10 above.)   Other clinical findings from Suarez's treating physician Dr.

Gitkind from November 2010 indicate that Suarez had some back tenderness, but maintained full

muscle strength in his lower extremities, had a normal gait and negative results on his straight leg

raise test, was independent in activities of daily living, and could ambulate without any assistive

device.  (See page 7 above.)  Similarly, Dr.Gitkind's clinical findings from the months following

Suarez's July 2012 MRI showed no local tenderness, no tenderness to palpation, and noted that

following Suarez's August 2012 spinal injection, he experienced good relief of his lower back pain.

(See pages 10-11 above.)  These relatively benign clinical findings, along with the lack of reference

to significant limitations in Suarez's mobility, are consistent with ALJ Russak's characterization of

the diagnostic imaging.  ALJ Russak also was correct that the record as a whole does not contain

any diagnostic imaging to show that Suarez has osteoarthritis in multiple joints.  Thus, ALJ Russak's

decision to give little weight to the opinions of Dr. Cabagnot and Dr. Florez is supported by

substantial evidence.

      Finally, Suarez argues that ALJ Russak "should not have granted controlling weight

to [the opinion of] Dr. Tedoff" because Dr. Tedoff was a consultative examining psychiatrist.

(Suarez Br. at 18.)  According to Suarez, a consulting physician's opinion should be given less

weight than those of a treating source if all else is equal and, in any event, should be given limited

weight.  (Suarez Br. at 18.)  This argument is without merit.

      It is well-settled that a consulting physician's opinion can constitute substantial

evidence supporting an ALJ's conclusions.  See, e.g., Rosier v. Colvin, 586 F. App'x 756, 758 (2d

Cir. 2014) (substantial evidence supporting ALJ's conclusion that a treating physician's opinion

should not be given controlling weight included evaluations by a consultative examiner); Diaz v.

Shalala, 59 F.3d 307, 315 (2d Cir. 1995) ("The opinions of three examining physicians, plaintiff's

own testimony, and the medical tests together constitute substantial evidence adequately supporting the [Commissioner's] conclusion that the plaintiff's injuries did not prevent her from resuming her job as a sewing machine operator."); Fuentes v. Colvin, No. 13-CV-6201, 2015 WL 631969 at *8 (W.D.N.Y. Feb. 13, 2015) ("'The opinion of a consultative examiner can constitute substantial evidence supporting an ALJ's decision.'"); Frawley v. Colvin, No. 5:13-CV-1567, 2014 WL 6810661 at *9 (N.D.N.Y. Dec. 2, 2014) ("The opinions of consultative examiners . . . may constitute substantial evidence where, as here, [they are] supported by the medical evidence in the record."); Leisten v. Colvin, No. 12-CV-6698, 2014 WL 4275720 at *14 (W.D.N.Y. Aug. 28, 2014).  Here, ALJ Russak gave "great weight" to Dr. Tedoff's opinion because "[h]is conclusions as to [Suarez's] social functioning provide the most reasonable explanation in the record for the disconnect between the generally benign mental status findings (indeed, Dr. Tedoff noted no mental status abnormalities at all), and the fact that [Suarez] has isolated himself socially to some extent."  (See page 22 above.) This is consistent with Dr. Bougakov's conclusion that Suarez's only significant vocational limitations were mild difficulties learning new tasks and performing complex ones (see page 6 above), and with the findings of Dr. Martinez and Dr. Choua, who both consistently found Suarez to have largely normal mental status examination results and a GAF score indicative of only moderate social limitations (see pages 8-9, 11 above).

Moreover, an ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence.  See, e.g., Rosier v. Colvin, 586 F. App'x at 758 (ALJ properly relied on evaluations by a consultative examiner to reject treating physician's opinion where other substantial evidence in the record was inconsistent with treating physician's opinion); Rivera v. Colvin, 13 Civ. 7150, 2015 WL 1027163 at *16 (S.D.N.Y. Mar. 9, 2015) ("It is not per se legal error

for an ALJ to give greater weight to a consulting opinion than a treating opinion."); Frawley v. Colvin, 2014 WL 6810661 at *5-7, *9-10 (ALJ's decision to give great weight to the opinion of a consultative psychological examiner was supported by substantial evidence because the opinion was consistent with the same medical medical evidence relied on by the ALJ to reject the treating psychologist's opinion); Manning v. Colvin, No. 13-CV-497, 2014 WL 5308189 at *8-9 (W.D.N.Y. Oct. 16, 2014) (ALJ properly gave little weight to the treating physician's opinion and "'great weight'" to the consultative examiner's prognosis because the consultative examiner's opinion was more consistent with the medical evidence of record); Leisten v. Colvin, 2014 WL 4275720 at *12-15 (ALJ did not err by affording treating doctor's opinions little weight and giving consultative examiners' opinions substantial weight because the treating doctor's opinion was inconsistent and unsupported while consultative examiners' opinions were supported by their examination results). ALJ Russak's determination than Dr. Choua's and Dr. Martinez's December 2012 opinion was entitled to little weight is supported by substantial evidence.  (See pages 34-35 above.)  Thus, having properly rejected their opinion, ALJ Russak was not required to give Dr. Tedoff's opinion less weight even though it more accurately reflects Suarez's mental status examination results.  Because Dr. Tedoff's opinion could constitute substantial evidence and was more consistent with the record as a whole than Dr. Choua's and Dr. Martinez's December 2012 opinion, ALJ Russak did not err in assigning it great weight.

Accordingly, the Court finds that ALJ Russak's RFC determination for Suarez is supported by substantial evidence in the record.

## 2. Credibility Determination

Because subjective symptoms  only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,'

the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence."  Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.'").[26/]  In addition, "courts must show special deference to an

---

[26/]   See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of (continued...)

ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[27/]

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996). The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[28/]

---

[26/] (...continued)
medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[27/] Accord, e.g., Campbell v. Astrue, 465 F. App'x 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

[28/] Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v.
(continued...)

ALJ Russak found that Suarez's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible" because "the objective physical and mental status examination results . . . do not reveal significant deficits in functioning." (See page 19 above.) Moreover, "objective tests such as diagnostic imaging of the lumbar spine and [Suarez's] abdomen have not revealed acute abnormalities of the type that would be expected to eliminate [Suarez's] ability to function over the course of a 40-hour workweek." (See page 19 above.) ALJ Russak also considered Suarez's testimony in light of the factors set forth in SSR 96-7p "because symptoms may sometimes suggest a greater degree of impairment than can be shown by the medical evidence alone." (See page 19 above.) ALJ Russak found that although Suarez denied performing productive activity during the day when he testified at the hearing, he had admitted in other parts of the record to "much greater abilities to handle his own personal care and household chores." (See pages 19-20 above.) ALJ Russak observed that Suarez's "symptoms appear to be relatively mild and intermittent, as he reported to Dr. Gitkind a 14-month period of relief in his back pain, and as the objective reports in the record from his psychiatric treatment providers and from the consultative examiners do not describe particularly frequent or intense mental health symptoms." (See page 20 above.) ALJ Russak also discussed the conflict between Suarez's report to Dr. Tedoff that he stopped working in March 2010 not because of his symptoms but because he was fired as a result of his drug and alcohol abuse and Suarez's testimony at the hearing that he quit his job due to back pain. (See page 2, 12, 20 above.) ALJ Russak noted that Suarez did not begin receiving treatment for his back pain until November 2010 and continued looking for work for several months after the

---

[28]/     (...continued)
          Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-
          7p, 1996 WL 374186 at *2.

March 2010 alleged onset of his disability.  (<u>See</u> page 20 above.)

Because Suarez's briefs, written by counsel, do not challenge ALJ Russak's credibility determination (see generally Dtk. No. 15: Suarez Br.), the Court need not further address the ALJ's credibility determination.

### E.   Suarez Did Not Have The Ability To Perform His Past Relevant Work

The fourth step of the five-step analysis asks whether Suarez had the RFC to perform his past relevant work.  (<u>See</u> page 27 above.)  ALJ Russak found, based on the vocational expert's testimony, that Suarez could not perform his past relevant work.  (<u>See</u> page 22 above.)  Because neither Suarez nor the Commissioner challenge this determination (see generally Dkt. No. 15: Suarez Br.; Dkt. No. 19: Gov't Br.), the Court proceeds to the final step of the five-step sequential analysis.

### F.   Vocational Expert Testimony Established That There Are Jobs In Substantial Numbers In The Economy That Suarez Can Perform

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training."  <u>Parker</u> v. <u>Harris</u>, 626 F.2d 225, 231 (2d Cir. 1980).[29]

In meeting his burden under the fifth step, the Commissioner:

may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404,

---

[29]   <u>See</u>, <u>e.g.</u>, <u>Roma</u> v. <u>Astrue</u>, 468 F. App'x 16, 20 (2d Cir. 2012); <u>Arruda</u> v. <u>Comm'r of Soc. Sec.</u>, 363 F. App'x 93, 95 (2d Cir. 2010); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 381 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999).

> Subpart P, App. 2, commonly referred to as "the Grid".  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations."  Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), report & rec. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert."  Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of

a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.'  Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing Bapp v. Bowen, 802 F.2d at 603, 605-06)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala v. Astrue, 595 F.3d at 411)).

ALJ Russak properly relied on the testimony of vocational expert DiStefano to find that jobs exist in significant numbers that Suarez could perform.  (See page 22 above.)[30/]  DiStefano testified that a hypothetical individual of Suarez's age, education and work background who was limited to a range of light work with an option to sit or stand, and that involved performing routine tasks with only occasional decision-making, no interaction with the public and only occasional

---

[30/]    A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to perform any of those jobs.  20 C.F.R. §§ 404.1566(e), 416.966(e); see, e.g., Calabrese v. Astrue, 358 F. App'x 274, 275-76 (2d Cir. 2009); Butts v. Barnhart, 416 F.3d at 103-04; Taylor v. Barnhart, 83 F. App'x 347, 350 (2d Cir. 2003); Jordan v. Barnhart, 29 F. App'x 790, 794 (2d Cir. 2002); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Dumas v. Schweiker, 712 F. 2d 1545, 1553-54 (2d Cir. 1983); DeJesus v. Astrue, 762 F. Supp. 2d 673, 693 n.20 (S.D.N.Y. 2011) (Peck, M.J.); Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 n.20 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.); report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sept. 12, 2006); De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Bosmond v. Apfel, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); Fuller v. Shalala, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, . . . provided several examples of unskilled . . . jobs that are available in the national and local economies for a person with [plaintiff's] condition, age, education, and work experience. . . . Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

interaction with coworkers, could work as an assembler, office helper and mail clerk, all of which are jobs that exist in significant numbers in the national and local economies. (See page 15 above.) ALJ Russak expressly relied on the vocational expert's testimony in reaching his conclusion. (See page 22 above.)

Suarez argues that ALJ Russak erred by not addressing the vocational expert's testimony (in response to Suarez's counsel's question) that a hypothetical individual whose ability to maintain concentration, pace and attention for periods of at least two hours was restricted to only two-thirds of the day would be unable to do the jobs DiStefano identified. (Dkt. No. 15: Suarez Br. at 19.) ALJ Russak, however, was not required to rely on that testimony. An ALJ has the authority to disregard a vocational expert's testimony where it is inconsistent with the underlying evidence. See, e.g., McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014) ("An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion' and accurately reflect the limitations and capabilities of the claimant involved." (citations omitted)); Phoenix v. Colvin, 14 Civ. 4164, 2015 WL 451016 at *21 (S.D.N.Y. Feb. 4, 2015) (Peck, M.J.); McAllister v. Colvin, No. 13-cv-940, 2015 WL 164783 at *10 (N.D.N.Y. Jan. 13, 2015) ("[A] hypothetical question need not include every limitation claimed or opined by a medical source deemed not credible. Rather, it must incorporate only limitations that the administrative law judge finds credible and which are supported by substantial evidence."); Krach v. Comm'r of Soc. Sec., No. 13-CV-1089, 2014 WL 5290368 at *11 (N.D.N.Y. Oct. 15, 2014) ("[T]here must be 'substantial [record] evidence to support the assumption upon which the vocational expert based his opinion.'" (quoting Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983)); Rivera v. Astrue, No. 11 Civ. 4132, 2012 WL 3307342 at *3, *5, *10 (E.D.N.Y. Aug. 11, 2012) (because the ALJ was entitled to disregard the opinions of the

plaintiff's treating physicians, the ALJ's hypothetical to the vocational expert was not required to incorporate added limitations based those opinions and the ALJ did not err by disregarding the vocational expert's testimony that an individual with those limitations could not perform the jobs she identified in response to the ALJ's questioning); Armstrong v. Comm'r of Soc. Sec., No. 06-CV-1049, 2009 WL 2883046 at *6 (N.D.N.Y. Sept. 4, 2009) (substantial evidence supported ALJ's finding that work existed in the national economy that plaintiff could perform even though ALJ reached that conclusion notwithstanding vocational expert testimony that a need for abrupt breaks and excessive absenteeism would impair a hypothetical employee's ability to work because the hypothetical limitations posed to the vocational expert were not supported by objective medical evidence).  ALJ Russak's hypothetical incorporated all of the limitations in his RFC determination for Suarez.  (See pages 15, 18 above.)  That RFC is supported by substantial evidence.  (See pages 32-40 above.)  The additional limitations Suarez claims ALJ Russak should have addressed were based on the December 2012 assessment by Dr. Choua and Dr. Martinez (Suarez Br. at 19), but ALJ Russak's decision to reject their opinion is supported by substantial evidence (see pages 34-35 above).  Thus, ALJ Russak was permitted to disregard DiStefano's response to the hypothetical posed by Suarez's counsel in determining whether work exists that Suarez could perform.

Finally, Suarez argues that ALJ Russak should have applied Grid rule 201.10 to find him disabled.  (Suarez Br. at 20.)  According to Suarez:

> The ALJ found that [he] could perform light work based on the consultative examiners' reports . . . [E]ven if [he] had been found capable of performing sedentary work, [he] should still be found disabled because as of November 8, 2011, he turned 50-years-old.  Therefore, [he] would meet GRID rule 210.10, which states that a claimant between the ages of 50 and 55 with a limited education, and past relevant work that did not provide for direct entry into sedentary work would be found to be disabled.

(Suarez Br. at 20.)  This argument is without merit.  ALJ Russak's determination that Suarez had the

RFC to perform <u>light</u> work, albeit with limitations, was supported by substantial evidence. (<u>See</u> pages 32-40 above.)  Therefore, Grid rule 201.10 regarding <u>sedentary</u> work is inapplicable by its own terms. <u>See</u> 20 C.F.R., Pt. 404, Subpt. P, App. 2 (Rule 201 applicable to claimants limited to sedentary work; rule 202 applicable to claimants limited to light work).

## **CONCLUSION**

For the reasons discussed above, the Commissioner's determination that Suarez was not disabled within the meaning of the Social Security Act is supported by substantial evidence.  The Commissioner's motion for judgment on the pleadings (Dkt. No. 18) is <u>GRANTED</u> and Suarez's motion for judgment on the pleadings (Dkt. No. 15) is <u>DENIED</u>.  The Clerk of Court shall close the case.

SO ORDERED.

Dated:      New York, New York
            May 6, 2015



_____
**Andrew J. Peck**
United States Magistrate Judge


Copies ECF to:      All Counsel